SEALED

# UNITED STATES DISTRICT COURT
### for the
### District of Hawaii

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

OCT 02 2013

at 9 o'clock and 25 min. A. M. 
SUE BEITIA, CLERK

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Information associated with Facebook user ID 54099038/ username "Macky-Kriszy Guerrero Domingo"

)
)
)
)
)
)

Case No.  13-1069 KSC

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is hereby attached and incorporated by reference into this warrant application.

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is hereby attached and incorporated by reference into this warrant application.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy |
| 18 U.S.C. § 553 | Exportation of stolen motor vehicles |
| 18 U.S.C. § 2312 | Transportation of stolen vehicles |

The application is based on these facts:

See Attachment C, which is hereby attached and incorporated by reference into this warrant application.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 2705(b), the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Ernest C. Durante, HSI Task Force Officer
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  _____10/02/2013_____

_____
*Judge's signature*

City and state:  Honolulu, Hawaii

Hon. Kevin S. Chang, U.S.M.J.
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with Facebook user ID 54099038/ username "Macky-Kriszy Guerrero Domingo" (hereinafter the "SUBJECT ACCOUNT"), which is stored at premises owned, maintained, controlled, or operated by Facebook, a company headquartered in Menlo Park, California.

<u>**ATTACHMENT B**</u>

**Particular Things to be Searched and Seized**

I.    **Information to be disclosed by Facebook**

To the extent that the information described in **Attachment A**, which is attached hereto

and fully incorporated by reference herein, is within the possession, custody, or control of

Facebook, including any messages, records, files, logs, or information that have been deleted but

are still available to Facebook, or have been preserved pursuant to a request made under 18

U.S.C. § 2703(f), Facebook is required to disclose the following information to the government

for the SUBJECT ACCOUNT, more fully described in **Attachment A**:

(a)    All records or other information regarding the identification of the SUBJECT

ACCOUNT, to include contact and personal identifying information, including

full name, user identification number, birth date, gender, contact e-mail addresses,

physical address (including city, state, and zip code), telephone numbers, screen

names, websites, and other personal identifiers. All activity logs for the account

and all other documents showing the user's posts and other Facebook activities;

(b)    All photos and videos uploaded by that user ID and all photos and videos

uploaded by any user that have that user tagged in them;

(c)    All profile information; News Feed information; status updates; links to videos,

photographs, articles, and other items; Notes; Wall postings; friend lists, including

the friends' Facebook user identification numbers; groups and networks of which

the user is a member, including the groups' Facebook group identification

numbers; future and past event postings; rejected "Friend" requests; comments;

gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(d)     All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(e)     All "check ins" and other location information;

(f)     All IP logs, including all records of the IP addresses that logged into the account;

(g)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(h)     All information about the Facebook pages that the account is or was a "fan" of;

(i)     All past and present lists of friends created by the account;

(j)     All records of Facebook searches performed by the account;

(k)     All information about the user's access and use of Facebook Marketplace;

(l)     The types of service utilized by the user;

(m)    The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(n)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(o)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## II.     Information to be seized by the government

The particular things to be seized by the United States include all information, which is described above in Section I of this Attachment (**Attachment B**) that pertains to the SUBJECT ACCOUNT, *see* **Attachment A**, that constitutes evidence or instrumentalities of violations of 18 U.S.C. §§ 371 (Conspiracy), 553 (Exportation of stolen motor vehicles), and 2312 (Transportation of stolen vehicles), as listed on the warrant, and occurring on or after June 12, 2011, namely:

(a)     All information, including but not limited to contents of communications, associated with the SUBJECT ACCOUNT, *see* **Attachment A**, which purport to discuss or otherwise pertain to obtaining, ordering, selling, buying, shipping, exporting, or trafficking stolen motorcycles, which are evidence or instrumentalities of violations of 18 U.S.C. §§ 371 (Conspiracy), 553 (Exportation of stolen motor vehicles), or 2312 (Transportation of stolen vehicles), including stored or preserved copies of Facebook messages sent to and from the SUBJECT ACCOUNT, draft Facebook messages, the source and destination Facebook email addresses and Facebook account names associated with each such Facebook message, the date and time at which each message was sent or drafted, and the size and length of each such message;

(b)     Contents of all communications between the SUBJECT ACCOUNT, *see* **Attachment A**, and the following Facebook accounts associated with Facebook usernames: "RANDY FERNANDO" (http://www.facebook.com/randy.fernando), "MELDRICK LAGUA" (email address: http://www.facebook.com/meldrick.lagua), and "ROGER JOHN CABALLERO FARINAS II" (email address:  http://www.facebook.com/Rj.Farinas), which are evidence or instrumentalities of violations of 18 U.S.C. §§ 371 (Conspiracy), 553 (Exportation of stolen

motor vehicles), or 2312 (Transportation of stolen vehicles), including stored or preserved copies of Facebook messages sent to and from the SUBJECT ACCOUNT, draft Facebook messages, the source and destination Facebook email addresses and Facebook account names associated with each such Facebook message, the date and time at which each message was sent or drafted, and the size and length of each such message;

(c)     All records or other information regarding the identification of the SUBJECT ACCOUNT and its user(s), to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, Facebook account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

(d)     The types of Facebook services utilized by the SUBJECT ACCOUNT;

(e)     All records and other information stored at any time by an individual using the SUBJECT ACCOUNT, including which Facebook usernames the SUBJCET ACCOUNT is "friends" with, calendar and location data, pictures and videos, and other data, which are evidence or instrumentalities of violations of 18 U.S.C. §§ 371 (Conspiracy), 553 (Exportation of stolen motor vehicles), or 2312 (Transportation of stolen vehicles), or that tend to identify the individual or individuals in control of the SUBJECT ACCOUNT;

(f)     All records pertaining to communications between Facebook and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken, which are evidence or instrumentalities of violations of 18 U.S.C. §§ 371 (Conspiracy), 553 (Exportation of stolen motor vehicles), or 2312 (Transportation of stolen

vehicles), or that tend to identify the individual or individuals in control, or who have been in control, of the SUBJECT ACCOUNT; and

(g)     Information relating to who created, used, or communicated with the SUBJECT ACCOUNT, including records about their identities and whereabouts, which are evidence or instrumentalities of violations of 18 U.S.C. § 1343 (wire fraud) or that tend to identify the individual or individuals in control of the SUBJECT ACCOUNT.

## Affidavit In Support of Application for a Search Warrant

I, Ernest Durante, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with Facebook user ID 54099038/username "Macky-Kriszy Guerrero Domingo" (hereinafter the "SUBJECT ACCOUNT"), which is stored at premises owned, maintained, controlled, or operated by Facebook, a social networking company headquartered in Menlo Park, California, as described in **Attachment A**, attached hereto and fully incorporated by referenced herein, for evidence and instrumentalities, *see* **Attachment B**, attached hereto and fully incorporated by referenced herein, of violations of 18 U.S.C. §§ 371 (Conspiracy), 553 (Exportation of stolen motor vehicles), and 2312 (Transportation of stolen vehicles).  More specifically, this affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), to require Facebook to disclose to the United States records and other information in its possession (including the content of communications), more fully described in **Attachment B**, pertaining to information associated with the SUBJECT ACCOUNT, more fully described in **Attachment A**.  Upon receipt of the information described in Section I of **Attachment B**, the United States – via government-authorized personnel – will review that information to locate the items described in Section II of **Attachment B**.

2.      I am a Task Force Officer with the Department of Homeland Security (DHS) Homeland Security Investigations (HSI), and have been since October 2010.  I am currently assigned to the HSI Office of the Special Agent in Charge, Honolulu, Hawaii (SAC Honolulu),

and investigate all laws related to Customs and Immigration. Prior to this, from June 2009 to October 2010, I was a Customs & Border Protection (CBP) Officer (Intelligence) where I served in a law enforcement capacity related to international travel, imports, and exports of passengers and cargo to detect smuggling of illegal drugs and other contraband. Additionally performed post seizure analysis and intelligence reporting for situational awareness for various ports of entry in the air, sea, and land border environments. From June 2003 to November 2009 I was a Customs and Border Protection Officer performing duties relating to regulating and facilitating international trade, collecting import duties, and enforcing U.S. regulations, including trade, customs and immigration and responsible for apprehending individuals attempting to enter the United States illegally, stemming the flow of illegal drugs and other contraband, and protecting American businesses from intellectual property theft. For CBP, I completed 11 weeks of training at the Federal Law Enforcement Training Center in Glynco, Georgia, which consisted of basic law enforcement skills, including Anti-Terrorism; Detection of Contraband; Interviewing; Cross-cultural Communications; Firearms Handling and Qualification; Immigration and Naturalization Laws; U.S. Customs Export and Import laws, Defensive Tactics; Arrest Techniques; Baton Techniques; Examination of Cargo; Bags and Merchandise; Border Search Exception; Entry and Control Procedures; Passenger Processing; and Officer Safety and Survival. As a CBP Officer, I have received classroom and on the job training in the areas of general law enforcement, interviews and interrogation, criminal law including search and seizure and in the identification of controlled substances, and trade enforcement involving intellectual property rights. Additionally, I completed the CBP Office of Field Operations (OFO) Task Force Officer Academy and the Joint Task Force Operations Training Program in Harpers Ferry, West Virginia. As a result of my training and experience,

I am familiar with how the various shipments containing contraband enter and depart the United States and patterns generally utilized by violators. I have also participated in numerous searches of shipments of suspected of containing and/or concealing contraband. I have also become knowledgeable with the process and databases used by US Customs and Border Protection to identify potential targets for inspection. Based on this experience, I have become well versed in the methodology utilized in the trafficking of contraband, including patterns of importation and exportation of contraband.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Facts not set forth herein are not being relied on in reaching my conclusion that the requested order should be issued. Nor do I request that this Court rely on any facts not set forth herein in reviewing this search warrant application.

4.      I am investigating the activities of Michael Anthony Francisco Domingo (DOMINGO) related to allegations that DOMINGO and others are involved in procuring motorcycles stolen in Honolulu County, Hawaii, having those stolen motorcycles disassembled and packaged in boxes, and then exporting the boxes containing dissembled stolen motorcycles from Hawaii to the Philippines for profit. This investigation has shown that, to promote and facilitate this illicit scheme, DOMINGO accepts orders for stolen motorcycles from unidentified person(s) in the Philippines using, among other means, the SUBJECT ACCOUNT, and also may use the SUBJECT ACCOUNT to communicate with others involved in this illicit trafficking scheme.

5.     As further stated below, and based on my training and experience, I respectfully

submit that probable cause exists to believe that violations of 18 U.S.C. §§ 371 (Conspiracy),

553 (Exportation of stolen motor vehicles), and 2312 (Transportation of stolen vehicles), have

been committed by Michael Anthony Francisco DOMINGO, and that information associated

with the SUBJECT ACCOUNT, further described in **Attachment B**, contains evidence of those

offenses, and that the SUBJECT ACCOUNT has been used as an instrumentality of those

offenses.  As such, probable cause exists to search the SUBJECT ACCOUNT, further described

in **Attachment A**, for the information set forth in **Attachment B**.

## JURISDICTION

6.     This Court has jurisdiction to issue the requested warrant because this Court is "a

court of competent jurisdiction," as defined by 18 U.S.C. § 2711. *See* 18 U.S.C. §§ 2703(a),

(b)(1)(A), (c)(1)(A).  Specifically, as made clear herein, the United States District Court for the

District of Hawaii "has jurisdiction over the offense being investigated."  18 U.S.C.

§ 2711(3)(A)(i).  Additionally, note that, pursuant to 18 U.S.C. § 2703(g), the presence of a law

enforcement officer is not required for the service or execution of the requested warrant.

## PROBABLE CAUSE

7.     The United States Department of Homeland Security, Homeland Security

Investigations (HSI) is investigating several targets for exporting and trafficking stolen motor

vehicles – namely, motorcycles – parts of stolen motorcycles, and conspiring to do the same in

the District of Hawaii, and elsewhere, for at least the last approximately two years.  Among

other things, evidence gathered to date has shown that the targets of this investigation –

including but not limited to DOMINGO, and Meldrick Lagua, Randy Fernando, and Roger

Farinas – are involved in buying stolen motorcycles from criminal associates, disassembling the

stolen motorcycles, packaging the bikes in boxes, and shipping the boxes from Honolulu County, Hawaii, to the Philippines. Moreover, the investigation has shown that DOMINGO has contacts in the Philippines to whom he exports and traffics stolen motorcycles, and from whom he accepts order for his illicit product using, among other means, the SUBJECT ACCOUNT.

8.     On June 12, 2013, the HSI conducted a buy/bust operation targeting Randy Fernando for the sale or receipt of stolen motorcycles and exportation of stolen motorcycles destined to the Philippines. An undercover cover agent (UCA) was used during the operation. Before the meeting, the UCA spoke to Fernando telephonically and made clear to Fernando that the UCA would only sell Fernando a stolen motorcycle if Fernando could guarantee the motorcycle would be shipped to the Philippines. Fernando indicated that the motorcycle the UCA sold Fernando would not stay in Hawaii, and would be sent to the Philippines. During the June 12, 2013, meet, after Fernando brokered a deal with the UCA to purchase a stolen motorcycle, agents approached Fernando and identified themselves as HSI agents. Fernando agreed to cooperate with law enforcement, and provided HSI with information including the following.

9.     Fernando positively identified DOMINGO as the person he knew as "Macky," who was the person in charge of sending motorcycles to the Philippines. Agents showed Fernando an unmarked black and white photo of Meldrick Lagua, and Fernando positively identified Lagua as someone who sold stolen bikes to DOMINGO. Fernando also stated that DOMINGO and Lagua were close friends. Fernando explained that if Domingo wanted to procure a stolen motorcycle, DOMINGO would ask Lagua, who in turn would bring and sell the requested stolen motorcycle to DOMINGO. Fernando stated he (Fernando) would obtain motorcycles based on particular requests that DOMINGO made, but would go and view the

motorcycles and report back to DOMINGO before buying a bike. If DOMINGO wanted to buy the stolen motorcycle, Fernando would meet with DOMINGO, and DOMINGO would give the money to Fernando to buy the motorcycle. Once Fernando paid the seller for a particular stolen motorcycle, per DOMINGO's request, Fernando would bring the motorcycle to DOMINGO's residence at 94-920 Kumuao Street, Waipahu, Hawaii 96797. Per Fernando, he had been involved with trafficking in stolen motorcycles and exporting them to the Philippines for about two years. Fernando noted that at the time he became involved in that illicit trade, DOMINGO indicated that DOMINGO was already involved in that scheme for some time with, among other persons, Roger John Caballero Farinas II of the Philippines. *See infra* ¶ 18.

10. On June 27, 2013, HSI conducted a buy/walk operation on DOMINGO for the sale of a stolen 2012 Honda CBR motorcycle with the assistance of Fernando. Fernando sent a photo, via text message, of a 2012 Honda CBR motorcycle to DOMINGO to see if DOMINGO was interested in buying the motorcycle. Fernando also conducted a consensually monitored phone call to DOMINGO, wherein DOMINGO agreed to purchase the stolen motorcycle for $800. DOMINGO then instructed Fernando to meet him to get the money for the stolen motorcycle. Fernando was equipped with a recording device and recorded the meeting.

11. Later on June 27, 2013, Fernando met with DOMINGO at Pho Bistro in Waipahu, Hawaii, and discussed the sale of the stolen motorcycle, as agents surveilled the meeting from outside the restaurant. Fernando advised agents that Lagua was with DOMINGO at the restaurant. At Pho Bistro, DOMINGO told Fernando that he only had half of the money for the motorcycle and needed to go to Wal-Mart in Kunia, Hawaii, to cash some checks to get the rest. DOMINGO and Lagua got into a Acura sports utility vehicle (SUV) and told Fernando to follow them to the Wal-Mart in Kunia, Hawaii. The Acura SUV parked in the Wal-Mart

parking lot, Lagua got out the vehicle and went into the Wal-Mart, while DOMINGO stayed in the vehicle. An officer posted inside the Wal-Mart observed Lagua cashing checks in the store. While Lagua was still in the Wal-Mart, DOMINGO got out of the Acura SUV and walked over to Fernando's parked vehicle. Agents watched as Fernando stood outside his vehicle and talked with DOMINGO. When Lagua exited the Wal-Mart a few minutes later, he approached DOMINGO and Fernando. Fernando later told agents that DOMINGO handed Fernando the cash. Shortly thereafter, agents observed all three men departed the Wal-Mart parking lot. HSI subpoenaed Wal-Mart for information about the checks that Lagua cashed, and in response Wal-Mart provided copies of two checks. The payor on both checks was Armstrong Building Maintenance (both DOMINGO and Lagua worked for Armstrong Building Maintenance). One check was made payable to Lagua for $227.63, and the other was made payable to DOMINGO for $231.41.

12.     Also, on June 27, 2013, the HSI selected a shipment with booking number 7934559, associated with shipping container number MATU2542393, for and outbound Customs inspection. The manifest for the shipment with booking number 7934559 described its contents as "household goods and personal effects," being exported to the Philippines. On July 2, 2013, HSI conducted a full inspection of the shipment (booking number 7934559), which was made up of multiple shipping boxes. Inside four of the boxes in that shipment, agents found various motorcycle parts. The shipping address on all 4 boxes was DOMINGO's address -- 94-920 Kumuao Street, Waipahu, HI 96797 -- and their shipper was identified as DOMINGO's mother (Tessie Domingo). Agents later determined that the motorcycles parts inside the 4 boxes were parts of two motorcycles: (1) a 2012-2013 Yamaha R1, red/black in color; and (2) a Suzuki GSXR, black in color. Regarding the Yamaha, a United States

Department of Defense (DOD) Registered Vehicle Decal, number K6J-8X3, was affixed to one of the Suzuki GSXR motorcycle parts and agents HSI agents provided that information to the Honolulu Police Department (HPD). On July 5, 2013, HPD advised HSI that the Suzuki GSXR motorcycle had been reported stolen on April 2, 2013, and referred agents to HPD Report Number 13-118035. Regarding the Suzuki, on July 8, 2012, HPD advised that the 2013 Yamaha R1 was reported stolen on May 21, 2013, and referred agents to HPD Report Number 13-184144.

13. On July 02, 2013, HSI agents conducted a consensual interview of DOMINGO, after approaching DOMINGO at his residence: 94-920 Kumuao Street, Waipahu, Hawaii 96797. After being advised of his *Miranda* rights, and agreeing to waive those rights and speak with agents, DOMINGO provided information including the following. After agents showed him pictures of the motorcycle parts that were found in the 4 boxes that were part of the shipment with booking number 7934559 (*i.e.*, that HSI searched on July 2, 2013), DOMINGO stated that he purchased those two motorcycles from his friend "Ryan," knew that the motorcycles were stolen, and was shipping the stolen motorcycles to the Philippines. DOMINGO claimed that he himself did not steal motorcycles, but rather only bought stolen motorcycles and shipped them to the Philippines. DOMINGO explained how he bought stolen motorcycles in Hawaii, disassembled and packaged them in boxes, and then shipped the stolen motorcycles to the Philippines for sale. More specifically, DOMINGO told agents that when he wanted to buy a stolen motorcycle he would call his friend "Mel." (Later in the interview, DOMINGO positively identified a photograph of Lagua as his friend "Mel.") DOMINGO stated that Lagua would obtain the motorcycle for DOMINGO and deliver the motorcycle to DOMINGO. Thereafter, DOMINGO said he would fill out the necessary shipping paperwork

and call the shipping company. Agents showed Domingo photos of specific shipping documents, including photographs and invoice/manifests from the shipment examined on July 2, 2013. DOMINGO admitted that he filled out the invoice paperwork for those boxes with his mother's name (Tessie Domingo). DOMINGO further admitted to remembering the specific boxes shown in the photos and admitted that he packed each box. DOMINGO also admitted that the boxes contained a total of at least two (2) stolen motorcycles. More generally, DOMINGO stated that usually seven (7) boxes are required to ship a single motorcycle to the Philippines, depending on the specific motorcycle being shipped. Agents terminated the July 2, 2013, interview of DOMINGO after DOMINGO verbally consented to agents' request to search his cellular telephone, but refused to sign a written consent to search form.

14.     Regarding the SUBJECT ACCOUNT, during the June 12, 2013, interview of Fernando, *see supra* ¶¶ 9-10, Fernando also told HSI agents that DOMINGO uses Facebook to receive orders for stolen motorcycles from the Philippines. Fernando stated that DOMINGO would use Facebook "messages" to obtain information regarding what type of motorcycles his buyer(s) – to be clear, whether DOMINGO has multiple buyers in the Philippines is unclear to Fernando – in the Philippines desired. Fernando further advised that DOMINGO had shown him DOMINGO's Facebook page – that is, the SUBJECT ACCOUNT – on DOMINGO's cell phone. Additionally, Fernando said that DOMINGO had shown him (Fernando) a Facebook "message" [when did Domingo from a contact of DOMINGO's in the Philippines (no further information) from whom DOMINGO took orders for stolen motorcycles. Fernando also told agents that he and DOMINGO were "friends" on Facebook.

15.     On June 25, 2013, and on July 17, 2013, Fernando met with HSI and agreed to log into his Facebook account – "RANDY FERNANDO"

(http://www.facebook.com/randy.fernando) – to permit agents to view to Fernando's Facebook page and other pages, including the SUBJECT ACCOUNT. Fernando logged on to Facebook from an HSI laptop, which was set up to capture screenshots from Fernando's Facebook page, the SUBJECT ACCOUNT, and other pages and information on Facebook that Fernando could access via his Facebook account. Among other pages, Fernando showed agents DOMINGO's Facebook page – that is, the SUBJECT ACCOUNT – which displayed a Facebook user name of "MACKY-KRISZY GUERRERO DOMINGO," and email address http://www.facebook.com/mackykriszy.domingo/about.

16.    Fernando showed agents that DOMINGO's Facebook page displayed photographs of DOMINGO, his wife, and his children, and Fernando further advised that he believed that DOMINGO's Facebook page was the same Facebook account that DOMINGO showed Fernando when DOMINGO showed Fernando the Facebook message from a contact of DOMINGO's in the Philippines regarding motorcycles. *See supra* ¶ 14. Fernando also told agents that he therefore believed that DOMINGO's Facebook page was the same Facebook account that DOMINGO used to facilitate the orders of stolen motorcycles between DOMINGO and his contact in the Philippines. On September 27, 2013, using a cover Facebook account, HSI confirmed that the SUBJECT ACCOUNT was still an active Facebook account and noted that DOMINGO posted information as recently as September 26, 2013, on a portion of the SUBJECT ACCOUNT that is accessible to anyone with a Facebook account (*i.e.*, even to those with whom the SUBJECT ACCOUT is not "friends").

17.    Additionally, Fernando told agents that he believed that at least two individuals involved with the stolen motorcycles were "friends" with DOMINGO on Facebook: Lagua and Roger Farinas. Fernando showed agents Lagua's Facebook page: Facebook user name

"MELDRICK LAGUA," and email address: http://www.facebook.com/meldrick.lagua/about.
Among other things, Lagua's Facebook page displayed photographs including one depicting a
large stack of what appeared to be $20 bills, and at least one photograph of Lagua with a
motorcycle. On September 27, 2013, using a cover Facebook account, HSI confirmed that
Lagua's Facebook account still appeared active.

18.     Fernando also showed agents the Facebook page of Roger John Caballero
Farinas II (RJ FARINAS), Facebook user name "ROGER JOHN CABALLERO FARINAS II,"
and email address: http://www.facebook.com/Rj.Farinas/about. Based on the information
posted on Farinas' Facebook page, which was accessible via Fernando's Facebook account on
June 25, 2013, and on July 17, 2013, Farinas appears to reside in the Philippines. Per Fernando,
DOMINGO indicated to Fernando that DOMINGO and Farinas had been involved with
trafficking stolen motorcycles before the time Fernando became involved with DOMINGO.
DOMINGO had advised that Farinas had family in the Philippines who were politically
connected in the Philippines. Fernando showed agents Farinas' Facebook page, including
pictures that depicted, among other things, Farinas with a black and grey colored motorcycle.
Further review of Farinas' Facebook photographs revealed additional pictures of various
motorcycles in the Philippines. (Comments associated with those photographs on Farinas'
Facebook page indicated that they were taken in Laoag City, Philippines.) Fernando also stated
that Farinas was possibly DOMINGO's motorcycle contact in the Philippines.

## PRESERVATION REQUEST – THE SUBJECT ACCOUNT

19.     On July 17, 2013, a 90-day preservation request made, pursuant to 18 U.S.C.
§ 2703(f), for the SUBJECT ACCOUNT was sent to Facebook. A request to extend

preservation of the SUBJECT ACCOUNT for an additional 90 days, pursuant to 18 U.S.C. § 2703(f), was submitted to Facebook on September 12, 2013.

## BACKGROUND REGARDING FACEBOOK

20.    Based on my training, experience, and conversations with other law enforcement officers, I have am aware of the information regarding Facebook, which is contained in this paragraph, as well as the paragraphs that follow that pertain to Facebook. *See infra* ¶¶ 19-37. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, like DOMINGO'S account identified in **Attachment A** (the SUBJECT ACCOUNT), and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

21.    Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

22.    Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's

account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

23.    Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

24.    Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

25.    Facebook allows users to upload photos and videos. It also provides users the ability to "tag" (*i.e.*, label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all

photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

26. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

27. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

28. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

29. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

30. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The

activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

31.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

32.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

33.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

34.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

35.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings;

rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

36.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

37.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

38.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## CONCLUSION

39.     Based on the forgoing information, probable cause exists to believe that the

SUBJECT ACCOUNT contains evidence and is an instrumentality of violations of 18 U.S.C.

§§ 371 (Conspiracy), 553 (Exportation of stolen motor vehicles), and 2312 (Transportation of

stolen vehicles).  As such, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C.

§ 2703(c), I respectfully request that the Court issue a warrant for the SUBJECT ACCOUNT,

more particularly described in **Attachment A**, authorizing the seizure, search and examination

of all items described in **Attachment B**.

40.     Because the warrant will be served on Facebook who will then compile the

requested records at a time convenient to it, reasonable cause exists to permit the execution of

the requested warrant at any time in the day or night.

DATED: _____10/2/2013_____          _Ernest C. Durante_____
                                    Ernest C. Durante, Special Agent
                                    Homeland Security Investigations


Sworn to before me this 2nd day of October, 2013, at Honolulu, Hawaii,


                                    _____
                                    UNITED STATES MAGISTRATE JUDGE